**Opinion issued April 9, 2019**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-18-01025-CV

———————————

## IN THE INTEREST OF L.W. AND L.W., CHILDREN

———————————

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-03500J**

———————————

### MEMORANDUM OPINION

In this accelerated appeal,[1] appellant, mother, challenges the trial court's order, entered after a bench trial, terminating her parental rights to her minor children, L.R.W. and L.D.W. (collectively, "the children").[2] In three issues, mother

---

[1] *See* TEX. FAM. CODE ANN. § 263.405(a); TEX. R. APP. P. 28.4.

[2] Our style of the case is in accord with the trial court's Final Decree for Termination. *See In re B.J.*, No. 01-15-00886-CV, 2016 WL 1389054, at *1 n.2 (Tex. App.—

contends that the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being;[3] she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being;[4] she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children;[5] and termination of her parental rights was in the best interest of the children.[6]

We affirm.

## Background

On June 26, 2017, the Department of Protective Services ("DFPS") filed a petition, seeking termination of mother's parental rights to the children and managing conservatorship of the children.

---

Houston [1st Dist.] Apr. 7, 2016, no pet.) (mem. op.); *Strobel v. Marlow*, 341 S.W.3d 470, 471 n.1 (Tex. App.—Dallas 2011, no pet.). However, for clarity purposes, in this opinion, we will refer to the children as L.R.W. and L.D.W. When the trial court terminated the parental rights of mother, L.R.W. was six years old and L.D.W. was two years old.

We note that the trial court also terminated the parental rights of the children's unknown father. He is not a party to this appeal. The record indicates that the children's father is deceased.

[3] *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D).

[4] *See id.* § 161.001(b)(1)(E).

[5] *See id.* § 161.001(b)(1)(O).

[6] *See id.* § 161.001(b)(2).

*DFPS Investigator Capps*

At trial, DFPS investigator Nicole Capps testified that on June 24, 2017, she received a "Priority 1" physical abuse referral that required an immediate response at a hospital. When Capps arrived at the hospital, she found that mother's third child, R.W., Jr., had died. R.W., Jr. was two years old at the time of his death. According to Capps, R.W., Jr. had cuts, bruises, and scabs in various stages of healing over his entire body. More specifically, Capps observed a large scab on the right side of R.W., Jr.'s forehead, "a purple-scabbed cut" and a quarter-sized bruise on the left side of his forehead, a right black eye, "[p]atterned marks under [his] left eye," a swollen left eye, a swollen left side of his face, "[v]arious cuts and scabs on [his] right neck area," a nickel-sized scab on his right upper chest, scabs on his right ear and marks behind his right ear, a "[p]atterned mark on [his] upper left arm that appeared purple," various scabs across his chest, stomach, and hip area, "[b]ruising to the left of [his] belly button and [on his] stomach," "[h]ealing scabs" on his right upper leg, a "1.5-inch scabbed mark on [his] right side," a half-dollar sized scab on his upper back, various other scabs on his back and an open wound on the right side of his back, healing scabs and a bruise on the back of his left leg, and scars and an open wound on the back of his upper right leg. Mother stated that R.W., Jr.'s injuries were caused by "r[unning] into a freezer"; however, in Capp's opinion, R.W., Jr.'s injuries indicated that someone had been physically abusing the child for a prolonged

3

period of time, and his injuries were not consistent with mother's explanation. Capps explained that R.W., Jr.'s death was ruled a homicide and it was not the result of an accident. Instead, the child had been "beaten to death." The trial court admitted into evidence numerous photographs of R.W., Jr. taken after his death which depict the child's numerous injuries.

Capps further testified that on June 24, 2017, i.e., the day of R.W., Jr.'s death, mother could not account for her whereabouts from approximately 3:00 p.m. until 9:00 p.m. Mother, however, indicated that during that time she had left her apartment and left the children and R.W., Jr. in the care of her boyfriend. Around 9:00 p.m., mother went to the children's maternal grandmother's home for approximately an hour, and mother was not at her apartment when R.W., Jr.'s body was found. According to Capps, at approximately 10:15 p.m. on June 24, 2017, R.W., Jr. arrived at the hospital and at 10:30 p.m. he was declared dead. While at the hospital, Capps also saw L.R.W., who was five years old at the time, and L.D.W., who was eight months old at the time, and both children appeared to be healthy. Although L.D.W. did not have any injuries, L.R.W. had "two scars that appeared to be healing, like fork kind of marks that were from like a curling iron [or] like a straightener."

Capps also explained that two days after R.W., Jr.'s death, L.R.W. was interviewed. During her interview, the child stated that on the day that R.W., Jr. had

4

died, he had "got[ten] a whooping and . . . his heart broken." L.R.W. further explained that mother's boyfriend fought with R.W., Jr., R.W., Jr. received a "hard whooping" from mother's boyfriend, and mother was in the apartment when her boyfriend "whoop[ed]" R.W., Jr. According to L.R.W., mother's boyfriend also made her and R.W., Jr. do "push[-]ups" when they got in trouble. In Capps's opinion, mother's failure to intervene while her boyfriend "beat[]" R.W., Jr. endangered the child's life as well as the lives of mother's two other children.

Regarding mother, Capps testified that, in general, when mother disciplined L.R.W. and R.W., Jr., prior to his death, she made them "get down in [a] push-up position for like an hour or until they got weak." Mother also regularly "whoop[ed]" L.R.W. and R.W., Jr. for fifteen minutes at a time, stopping only when L.R.W. or R.W., Jr. began to scream. Capps noted that mother physically disciplined L.R.W. and R.W., Jr. in the bathroom of her apartment, mother would have L.R.W. and R.W., Jr. "put their hands on the toilet," and mother would close the bathroom door so that L.R.W. and R.W., Jr. could not escape. Because L.R.W. and R.W., Jr. moved around when they were being physically disciplined, various parts of their bodies would be hit. In other words, according to Capps, when mother "beat[] them with a belt[,] . . . she would be hitting them all over their bod[ies]." Mother admitted to leaving marks on L.R.W. and R.W., Jr. "a few times." In Capps's opinion, mother's "beating[]" of R.W., Jr. "four times a day" constituted endangering conduct.

5

With respect to R.W., Jr., specifically, mother admitted to physically hitting the child, including hitting him on the day that he died. Mother also admitted that she had "whoop[ed]" the child multiple times a day in the days leading up to R.W., Jr.'s death. According to mother, on the day that R.W., Jr. died, he and L.R.W. had dropped food on the floor of the apartment and this prompted her to physically discipline them. In total, L.R.W. and R.W., Jr. received four "whipp[ings]" on the day that R.W., Jr. died. Mother further stated that she was the only person who had ever physically hit and physically disciplined R.W., Jr. And when mother physically disciplined R.W., Jr., she would "corner him in a bathroom so [that] he could not escape." In Capps's opinion, "some of [mother's] physical discipline resulted in the injuries [she] observed on" R.W., Jr., and Capps believed that "mother was beating the child."

Capps also testified that mother knowingly left the children and R.W., Jr. in the care of her boyfriend, who used illegal narcotics and who smoked marijuana while caring for the children and R.W., Jr. And mother's boyfriend admitted that he disciplined L.R.W. and R.W., Jr. by hitting them with his hand and with a belt. In Capps's opinion both mother and her boyfriend caused R.W., Jr.'s death.

### *DFPS Caseworker Mangram*

DFPS caseworker Kamma Mangram testified that mother reported to her that on the day that R.W., Jr. died, mother, her boyfriend, the children, and R.W., Jr. were

6

at her apartment.  Mother woke up around 7:00 a.m. or 8:00 a.m., and at some point, L.R.W. asked mother to make her something to eat, which she did.  Mother then put L.R.W. and R.W., Jr. in the living room and went back to her bedroom where her boyfriend was still sleeping.  Mother's boyfriend later woke up around 12:00 p.m. or 1:00 p.m. because L.R.W. and R.W., Jr. were being loud.  At that time, mother got up and found that the L.R.W. and R.W., Jr. had not eaten their food and "there was food all over the floor."  Mother physically disciplined L.R.W. because there was food on the floor.  At some point, mother went outside to her car for a period of time between ten and thirty-five minutes.  As mother climbed the stairs to return to her apartment, she heard R.W., Jr. crying loudly.  When mother got upstairs, she found that the door to her apartment had been locked by her boyfriend.  Mother stood outside for a few minutes listening to R.W., Jr. cry before her boyfriend unlocked the door.  When mother opened the door, R.W., Jr. ran to her and she told her boyfriend "that was enough."  This caused her boyfriend to "stop[]."  Mother told Mangram that when she stated "that was enough" she meant that her boyfriend had done "enough" hitting and spanking of R.W., Jr. with a belt.

Mangram further testified that mother could not recall what else happened on the day that R.W., Jr. died until about 7:00 p.m. when the children's maternal grandmother called mother.  Thereafter, mother spent thirty-five minutes getting dressed and left her apartment to get food for the maternal grandmother.  When

7

mother left, the children and R.W., Jr. stayed at the apartment with mother's boyfriend. Mangram noted that mother left the children in the care of her boyfriend despite the fact that her boyfriend had physically disciplined R.W., Jr. that day and caused the child to cry loudly. While mother was gone from her apartment, her boyfriend called. By the time that mother arrived home, sometime between 8:00 p.m. and 9:00 p.m., R.W., Jr. had stopped breathing. A call was made for emergency assistance around 9:39 p.m. R.W., Jr. was declared dead around 10:00 p.m., and Mangram stated that the child's cause of death was "blunt force." At the time of R.W., Jr.'s death, he had bruises, cuts, scrapes, and abrasions all over his body, and his wounds were in various stages of healing.

Mangram noted that mother reported to hospital personnel that her boyfriend had stated that R.W., Jr. had fallen out of his bed and was vomiting at approximately 8:45 p.m. And according to Mangram, if such a report was true, then mother and her boyfriend had waited an hour before calling for emergency assistance. Mangram opined that the delay in seeking medical treatment for R.W., Jr. was significant and inexcusable.

Mangram also noted that mother told her that a day or two prior to R.W., Jr.'s death, he was running around the living room with L.R.W. and L.R.W. "pushed [him] into the deep freezer." Mother reported that R.W., Jr. was "okay right after that, but that a little bit later, he went and laid down for a while . . . [which] was

unusual." Mother also reported to Mangram that she had physically disciplined R.W., Jr. in the days leading up to the child's death, and mother stated that she had cornered him in the bathroom so that he could not run away while she "beat" him.

Mangram opined that mother had endangered the lives of the children because they were present when R.W., Jr. was being physically abused. And Mangram noted that the marks and bruises on R.W., Jr. did not indicate that what had happened to the child on the day of his death was a "one-time incident." Rather, it appeared that R.W., Jr. had been "abused for a substantial amount of time," and mother did not seek medical treatment for the child's injuries. Mangram noted that at the time that the children entered DFPS's care, L.R.W. had a burn on her leg.

With respect to mother's boyfriend, Mangram explained that he kept marijuana and marijuana paraphernalia in mother's home, specifically in the top drawer of mother's nightstand, and it was "[c]leary evident to anyone." Moreover, mother's boyfriend admitted to smoking marijuana while caring for the children and R.W., Jr. In Mangram's opinion, a parent who knowingly left her children with someone who smoked marijuana while caring for the children engaged in endangering conduct and created a dangerous environment. Additionally, mother admitted to Mangram that her boyfriend had physically disciplined L.R.W. and R.W., Jr. and she knew that he did so. In fact, mother could recall specifically that her boyfriend had physically injured or disciplined R.W., Jr. on three separate

9

occasions, including on the day of the child's death, because R.W., Jr. would "not sit[] on a potty." When asked whether mother "knew that [her boyfriend] was beating" L.R.W. and R.W., Jr., Mangram responded that "[s]he did." Mangram opined that mother's action in allowing her boyfriend to "beat" L.R.W. and R.W., Jr. constituted endangering conduct and created a dangerous environment.

Mangram further testified, related to mother, that mother admitted to disciplining L.R.W. and R.W., Jr. by making them "get in [a] push-up position for like an hour or until they g[o]t weak." Mother also admitted to "whoop[ing]" L.R.W. and R.W., Jr. for fifteen minutes at a time, stopping only when they started screaming or she could see marks. And mother conceded that she had previously left marks on L.R.W. and R.W., Jr. Moreover, mother stated that she had "whoop[ed]" L.R.W. and R.W., Jr. four times a day every other day. And when she did so, she placed them in the bathroom with the bathroom door closed. Because L.R.W. and R.W., Jr. would move around while being hit, mother would hit various parts of their bodies. When asked whether mother "literally trapp[ed] th[e] kids in the bathroom so [that] she c[ould] beat them," Mangram responded, "[y]es." Mangram noted that mother's physical discipline did not constitute "normal . . . spanking discipline."

Mangram also explained that after the children entered the care of DFPS, mother received a Family Service Plan ("FSP"), which she did not complete. For instance, mother did not obtain stable housing and did not demonstrate that she could

provide a loving and nurturing home for the children. Mangram noted that, during the pendency of the instant case, mother spent time in jail, and she had not seen the children since the time of R.W., Jr.'s death. After mother was released from jail on bond in April 2018, she began living with the children's maternal grandmother, who had a "CPS history." Thus, DFPS did not consider mother's housing to be adequate, and Mangram expressed concern about the children ever being placed with the maternal grandmother because she had access to R.W., Jr. prior to his death and yet never reported any physical abuse that the child had sustained.

Regarding the children, Mangram stated that they were placed together in an adoptive foster home. The foster home was safe, stable, nurturing, and loving, and the children had been in the foster home for more than one year. L.R.W. was "very close" with her foster family, and she relied on her foster parents for emotional support. L.R.W. wanted to continue living with her foster parents, and the foster parents wanted the children to continue living with them.

Moreover, Mangram explained that the foster family was all that L.D.W. had ever known, L.D.W. interacted with his foster parents, and he did not leave his foster parents' side. The children both "look[ed] to their foster parents for comfort and care" and were comfortable living with their foster parents. Additionally, the children's foster parents had provided for the children's needs, and Mangram believed that they would continue meeting the children's emotional and physical

11

needs in the future. The children were not in emotional or physical danger in their foster parents' home and were not "beaten." The children's foster parents had excellent parenting abilities, had taken advantage of the services and the programs that were available to them, and the children were receiving any therapy, medical attention, and dental work that was required. The children's foster parents believed that education was important, and they wanted the children to graduate high school and attend college. Mangram noted that the foster parents' grandchild, who was L.R.W.'s age, lived in the home as well and the children shared a sibling bond with that child.

Mangram further testified that after entering the care of DFPS, L.R.W. disclosed that mother had "beat[]" L.R.W. and R.W., Jr. and mother's boyfriend had beat them while mother was in the same room. L.R.W. also reported that mother's boyfriend had sexually abused her. L.R.W. explained that mother's boyfriend "g[ot] naked and g[ot] in the bed with her." And when mother then walked into the room, she told her boyfriend to stop, but he did not and mother "didn't do anything about it." L.R.W. additionally disclosed that mother's boyfriend "touch[ed] her pee pee" and "rubb[ed] her pee pee," she told mother, and mother "had seen it." Mangram opined that the fact that L.R.W. was sexually abused in mother's home created a dangerous environment for the children. After L.R.W. entered DPFS's care, she began attending therapy related to the sexual abuse that she had suffered.

*DFPS Special Investigator Jones*

DFPS special investigator Vernon Jones testified that he interviewed mother regarding R.W., Jr.'s death. During her interview, mother stated that on the day that R.W., Jr. died, she woke up around 7:00 a.m. to check on the children and R.W., Jr. and then went back to sleep until 11:00 a.m. At that time, mother woke up and fed the children and R.W., Jr. According to mother, between 11:00 a.m. and 2:00 p.m., she had to discipline L.R.W. and R.W., Jr. "a couple of times." In total, mother stated that she had physically disciplined L.R.W. and R.W., Jr. four or five times on the day of R.W., Jr.'s death for fifteen minutes each time. Mother could not account for her whereabouts or her actions from 2:00 p.m. until 9:00 p.m. At 9:00 p.m., mother went to pick up food for the children's maternal grandmother and left the children and R.W., Jr. in the care of her boyfriend. While mother was out, her boyfriend called and told her that R.W., Jr. was not breathing, which prompted mother to return to her apartment.

Regarding disciplining L.R.W. and R.W., Jr., who were five years old and two years old, respectively, at the time of R.W., Jr.'s death, mother generally explained that she would discipline them "physically with a belt . . . four times every other day." Each disciplining session would last fifteen minutes and would take place in the bathroom. Mother "would have the kids put their hands . . . on the toilet so that they wouldn't be able to move around" and she closed the door to the bathroom "so

they couldn't run from her." She would also make L.R.W. and R.W., Jr. "get in [a] push[-]up position until they experienced muscle failure." According to mother, she disciplined the children herself and her boyfriend did not do so. Thus, mother took responsibility for any marks and bruises found on R.W., Jr. at the time of his death. However, mother ultimately offered no explanation for R.W., Jr.'s death "other than [by] saying that the children were playing rough with each other." In Jones's opinion, R.W., Jr. ultimately died from blunt force trauma caused by mother.

Jones further testified that during his investigation, he went to mother's apartment, which was "not in a clean condition." The apartment was cluttered and had old food and trash all around. Jones noted that he found "blood droplets" on the walls. Jones opined that the condition of mother's home alone was endangering to the children.

### Assistant Medical Examiner Hopson

Dr. Dana Hopson, assistant medical examiner at the Harris County Institute of Forensic Sciences ("HCIFS"), testified that she performed an autopsy on the body of R.W., Jr. Regarding R.W., Jr.'s external injuries, Hopson testified that the child had numerous bruises or contusions on different areas of his body, including on his chest, abdomen, back, arms, and legs. R.W., Jr. also had abrasions or scrapes on his skin and "blunt force injuries" on his face and on multiple areas of his body. Related to his back, Hopson noted that R.W., Jr. had "a lot of bruises that were . . . various

14

sizes that . . . involv[ed] the majority of his back." When asked whether she "saw bruises and marks on [R.W., Jr.'s] body" "from head to toe," Hopson responded, "[y]es." Moreover, Hopson explained that R.W., Jr. had scars inside the lower part of his lip and a laceration of the lip, and she saw scars on his legs. In Hopson's opinion, R.W., Jr.'s lip injury would have been associated with some type of "blunt trauma."

With respect to R.W., Jr.'s internal injuries, Hopson explained that R.W., Jr. had "an injury [to] the right side of [his] diaphragm, which [was] the main muscle that help[ed] with breathing" and "bruising or [a] hemorrhage of the lining over . . . one area of [his] small intestine[]." R.W., Jr. also had a "fracture on the back side of his right tenth rib," which showed no evidence of healing and thus likely occurred at or around the time of the child's death. Further, R.W., Jr. had "bleeding that was over the brain" which was caused by "blunt trauma" with "enough force to tear the veins that attach the dura mater to the brain." A neuropathologist, with whom Hopson had consulted, also found "some focal regions of bleeding within [R.W., Jr.'s] brain." Hopson opined that the injuries to R.W., Jr.'s brain did not appear to be "weeks old"; instead, they likely occurred between "24 hours to a few minutes before [the child] died." According to Hopson, the injury to R.W., Jr.'s head was a significant injury.

Hopson further testified that while the bleeding in R.W., Jr.'s brain, the trauma to R.W., Jr.'s head, the injuries that he had to his torso, and the "bleeding in the soft tissues beneath [his] skin," contributed to R.W., Jr.'s death, the cause of R.W., Jr.'s death was "multiple blunt force injuries," which would have been caused by "some kind of force," i.e., either his body hitting another object or another object hitting his body. The locations of R.W., Jr.'s injuries did not indicate that they were caused by a single impact, rather his injuries indicated multiple impacts. The manner of R.W., Jr.'s death was homicide. In Hopson's opinion, R.W., Jr.'s death was not the result of an accident and "[s]omebody [had] killed th[e] child."

***Mother's FSP***

The trial court admitted into evidence mother's FSP which states that on June 24, 2017, two-year-old R.W., Jr. was declared dead at a hospital after mother's boyfriend reported that he heard a "thud" while in another room in mother's apartment smoking marijuana. According to mother's boyfriend, he went into the room where R.W., Jr. was and found the child crying and throwing up; R.W., Jr. then became unresponsive. At the hospital, R.W., Jr. was "found to be covered in various bruises, scratches, [and] open wounds" and he had swelling to his face and head.

Mother reported that she had physically disciplined R.W., Jr. with a belt on more than one occasion in the two days prior to the child's death. Mother's

boyfriend also admitted to disciplining L.R.W. and R.W., Jr. with his hand and a belt. According to mother's FSP, R.W., Jr. was singled out and physically beaten to death by mother and her boyfriend, and the child had been denied essential medical treatment. Both mother and her boyfriend were charged with the felony offense of injury to a child and "held at the Harris County jail."

Mother's FSP also states that L.R.W. and L.D.W., who were five years old and eight months old, respectively, at the time of R.W., Jr.'s death, were vulnerable. And because of their ages, the children were "unable to recognize and flee a dangerous situation or seek outside protective resources." Given the nature of R.W., Jr.'s death, the FSP notes that mother had demonstrated an unwillingness or inability to protect the children. Moreover, L.R.W. had expressed fears of being seriously harmed in the care of mother and mother's boyfriend, and she reported that the physical abuse that she and R.W., Jr. had suffered was not the result of an isolated incident.

Further, with respect to mother, the FSP explains that she had a significant lack of knowledge concerning child development and a significant lack of parenting skills needed to meet any child's behavioral and developmental needs. Moreover, mother's disciplining behaviors seemed violent, out of control, and disproportionately harsh compared to L.R.W.'s and R.W., Jr.'s misbehavior. Mother also left the children and R.W., Jr. with an inappropriate caregiver. And mother

17

reported a history of domestic violence with the children's father before his death and a history of domestic violence with her boyfriend, who was "in and out of the home." Mother did not acknowledge a problem with the abuse that R.W., Jr. suffered and offered implausible explanations regarding the abuse and the cause of R.W., Jr.'s death. Mother was unwilling and unable to protect the children from those who might harm them.

### Indictment

The trial court admitted into evidence a copy of mother's indictment for the felony offense of injury to a child.[7] The indictment states that mother "on or about June 24, 2017, did then and there unlawfully, intentionally and knowingly cause serious bodily injury to [R.W., Jr.], . . . a child younger than 15 years of age, by striking [him] with her hand[,] . . . with a belt[,] . . . [or] with an unknown object" or "by striking [R.W., Jr.] against an unknown object."

### Medical Records

The trial court admitted into evidence a copy of R.W., Jr.'s medical records that state that R.W., Jr., a two-year-old, arrived at the hospital with significant injuries to his head, "multiple body injuries," and "obvious multiple prior injuries," and in cardiac arrest. Hospital personnel were told that R.W., Jr. was left at home with mother's "friend" while mother went to get food. Mother's friend told her that

---

[7]    *See* TEX. PENAL CODE ANN. § 22.04(a)(1).

at 8:45 p.m. R.W., Jr. fell out of a bunk bed, which was approximately five feet above the ground. R.W., Jr. was reportedly awake and alert after the fall. One hour after the fall, however, the child began vomiting and lost consciousness. Mother reported that earlier in the day R.W., Jr. had hit his head on a "freezer cooler." Emergency assistance was called for at 9:39 p.m. and arrived at 9:45 p.m. At the time that emergency assistance arrived, R.W., Jr. was asystole. When R.W., Jr. was examined at the hospital, at 10:18 p.m., he showed "signs of multiple old injuries." The medical records note that abuse was suspected and list some of R.W., Jr.'s injuries as follows: multiple abrasions to upper and lower back, two large abrasions to upper chest, large old abrasions on the right temporal area, large contusion on the left side of face, left periorbital ecchymosis, upper and lower left eyelids swelling from contusions and ecchymosis, and left eye closed shut. R.W., Jr. was declared dead at 10:30 p.m.

*Autopsy Report*

The trial court admitted into evidence a copy of assistant medical examiner Hopson's autopsy report which states that R.W., Jr.'s cause of death was "[m]ultiple blunt force injuries" and his manner of death was homicide. The autopsy report extensively details the numerous external and internal injuries suffered by R.W., Jr.

A Report of Anthropology Consultation included with Hopson's autopsy report, states, regarding the rib fracture suffered by R.W., Jr., that no healing was

19

observed and the "[t]he characteristics of the fracture [were] consistent with a minimum of one blunt force impact to the right side of the back by an object of indeterminate surface area, occurring at or around the time of [R.W., Jr.'s] death." Further, "[p]ossible acute trauma [was] . . . present on the head and costochondral ends of all retained ribs," and injuries in such locations were "typically associated with compression of the rib cage."

Additionally, an HCIFS Investigator Death Report included with Hopson's autopsy report states that on June 24, 2017, mother left the children and R.W., Jr. in the care of her boyfriend, with whom she lived so that she could go buy food. While mother was gone, R.W., Jr. began vomiting and mother's boyfriend called mother to ask her to return home. When mother arrived, R.W., Jr. was unresponsive. Hospital personnel noted several bruises throughout R.W., Jr.'s body in various stages of healing and there was an abrasion and bruise on the child's face. It was reported that R.W., Jr. had hit his head on a freezer and had fallen from a bunk bed several times. However, an investigation revealed that the only freezer in mother's home was a three-foot-tall plastic freezer. And the bunk bed in mother's apartment had a rail along the top bunk, which was five feet above the ground, and a bottom bunk that was only a foot above the ground. Mother's home was found to be unkempt and several belts were scattered throughout the residence. The children had bruising on them when they were placed in the care of DFPS.

20

### *Maternal Grandmother*

The children's maternal grandmother testified that on the day of R.W., Jr.'s death, mother picked her up around 7:45 p.m. or 8:00 p.m., but mother did not have the children or R.W., Jr. with her. Thereafter, mother took the maternal grandmother "[t]o several food places," until mother received a telephone call. Mother then rushed to take the maternal grandmother home and then rushed to her own home. Mother later called the children's maternal grandmother to tell her that R.W., Jr. was not breathing and that he was in the hospital.

Regarding R.W., Jr., the children's maternal grandmother testified that R.W., Jr. was an energetic kid who would "jump[] off of stuff," scream, holler, and kick. And he would injure himself from time to time. With respect to mother, the maternal grandmother testified that she did not have a criminal history and she did not discipline the children and R.W., Jr. Instead, mother would put them in a corner and tell them to sit, but the children and R.W., Jr. would "run around, cry, and scream." According to the maternal grandmother, mother was a good mother, and the person that was often referred to as mother's boyfriend throughout trial was not in fact her boyfriend, but rather a friend to her and the children's father before the father's death. The maternal grandmother opined that mother would not have had "any idea [what] that . . . man might do" to R.W., Jr.

21

The children's maternal grandmother further testified that she currently lived in a home with her four children, including mother, and the maternal grandmother wanted the children to be placed with her.

**Standard of Review**

A parent's right to "the companionship, care, custody, and management" of her children is a constitutional interest "far more precious than any property right." *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982) (internal quotations omitted). The United States Supreme Court has emphasized that "the interest of [a] parent[] in the care, custody, and control of [her] children . . . is perhaps the oldest of the fundamental liberty interests recognized by th[e] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). Likewise, the Texas Supreme Court has concluded that "[t]his natural parental right" is "essential," "a basic civil right of man," and "far more precious than property rights." *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985) (internal quotations omitted). Consequently, "[w]e strictly construe involuntary termination statutes in favor of the parent." *In re E.N.C.*, 384 S.W.3d 796, 802 (Tex. 2012).

Because termination of parental rights is "complete, final, irrevocable and divests for all time that natural right . . . , the evidence in support of termination must be clear and convincing before a court may involuntarily terminate a parent's rights." *Holick*, 685 S.W.2d at 20. Clear and convincing evidence is "the measure or degree

22

of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007; *see also In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). Because the standard of proof is "clear and convincing evidence," the Texas Supreme Court has held that the traditional legal and factual standards of review are inadequate. *In re J.F.C.*, 96 S.W.3d at 264–68.

In conducting a legal-sufficiency review in a termination-of-parental-rights case, we must determine whether the evidence, viewed in the light most favorable to the finding, is such that the fact finder could reasonably have formed a firm belief or conviction about the truth of the matter on which DFPS bore the burden of proof. *Id.* at 266. In viewing the evidence in the light most favorable to the finding, we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so," and we "should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005) (internal quotations omitted). However, this does not mean that we must disregard all evidence that does not support the finding. *In re J.F.C.*, 96 S.W.3d at 266. Because of the heightened standard, we must also be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.* If we determine that no reasonable trier of fact could form a firm belief or conviction that the matter that must be proven is true, we

must hold the evidence to be legally insufficient and render judgment in favor of the parent. *Id.*

In conducting a factual-sufficiency review in a termination-of-parental-rights case, we must determine whether, considering the entire record, including evidence both supporting and contradicting the finding, a fact finder reasonably could have formed a firm conviction or belief about the truth of the matter on which DFPS bore the burden of proof. *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). We should consider whether the disputed evidence is such that a reasonable fact finder could not have resolved the disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266–67. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal quotations omitted).

**Sufficiency of Evidence**

In her first, second, and third issues, mother argues that the trial court erred in terminating her parental rights to the children because the evidence is legally and factually insufficient to support the trial court's findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being; she engaged, or knowingly

24

placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being; she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children; and termination of her parental rights was in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E), (O), (b)(2).

In order to terminate the parent-child relationship, DFPS must establish, by clear and convincing evidence, one or more of the acts or omissions enumerated under Texas Family Code section 161.001(b)(1) and that termination is in the best interest of the child. *See id.* § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Id.*; *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). Notably though, "[o]nly one predicate finding under section 161.001[(b)](1) is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003).

## A. Endangerment

In her first issue, mother argues that the evidence is legally and factually insufficient to support the trial court's termination of her parental rights to the children under Texas Family Code sections 161.001(b)(1)(D) and (E) because the children were not harmed and were healthy, "many things . . . contributed to R.W.,

25

Jr.'s death," mother "did not suspect [that her boyfriend would] lock the door" to her apartment or that "L.R.W. would shove R.W., Jr.," and "there is no clear and convincing evidence that would allow the trier of fact to determine" that L.R.W. was sexually abused by mother's boyfriend. *See* Tex. Fam. Code Ann. § 161.001(b)(1)(D), (E).

A trial court may order termination of the parent-child relationship if it finds by clear and convincing evidence that a parent has "knowingly placed or knowingly allowed the child[ren] to remain in conditions or surroundings which endanger[ed] the[ir] physical or emotional well-being." *Id.* § 161.001(b)(1)(D). A trial court may also order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has "engaged in conduct or knowingly placed the child[ren] with persons who engaged in conduct which endanger[ed] the[ir] physical or emotional well-being." *Id.* § 161.001(b)(1)(E). Because the evidence related to Texas Family Code sections 161.001(b)(1)(D) and (E) are interrelated, we consolidate our examination. *See In re L.M.N.*, No. 01-18-00413-CV, 2018 WL 5831672, at *12 n.38 (Tex. App.—Houston [1st Dist.] Nov. 8, 2018, pet. denied) (mem. op.); *In re J.T.G.*, 121 S.W.3d 117, 126 (Tex. App.—Fort Worth 2003, no pet.).

Both subsections D and E require proof of endangerment. To "endanger" means to expose the children to loss or injury or to jeopardize their emotional or

physical health. *Boyd*, 727 S.W.2d at 533 (internal quotations omitted); *Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet. denied) (internal quotations omitted). The children are endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards. *J.S. v. Tex. Dep't of Family & Protective Servs.*, 511 S.W.3d 145, 159 (Tex. App.—El Paso 2014, no pet.); *In re S.M.L.*, 171 S.W.3d 472, 477 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment." *Boyd*, 727 S.W.2d at 533. However, it is not necessary that the endangering conduct be directed at the children or that the children actually suffer injury. *Id.*

While both subsections D and E focus on endangerment, they differ regarding the source of the physical or emotional endangerment to the children. *See In re B.S.T.*, 977 S.W.2d 481, 484 (Tex. App.—Houston [14th Dist.] 1998, no pet.). For instance, subsection D focuses on the children's surroundings and environment and requires a showing that the environment in which the children were placed endangered their physical or emotional health. *Doyle v. Tex. Dep't of Protective & Regulatory Servs.*, 16 S.W.3d 390, 394 (Tex. App.—El Paso 2000, pet. denied); *see also In re M.R.J.M.*, 280 S.W.3d 494, 502 (Tex. App.—Fort Worth 2009, no pet.); *In re S.M.L.*, 171 S.W.3d at 477. "Environment" refers to the acceptability of the

27

children's living conditions as well as the conduct of a parent or other person in the home because the conduct of a parent or other person can create an environment that endangers the children's physical and emotional well-being. *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (internal quotations omitted); *see also In re I.L.L.*, No. 14-09-00693-CV, 2010 WL 4217083, at *6 (Tex. App.—Houston [14th Dist.] Oct. 26, 2010, no pet.) (mem. op.); *In re B.R.*, 822 S.W.2d 103, 106 (Tex. App.—Tyler 1991, writ denied) ("It is illogical to reason that inappropriate, debauching, unlawful, or unnatural conduct of persons who live in the home of a child, or with whom a child is compelled to associate on a regular basis in his home, are not inherently a part of the 'conditions and surroundings' of th[e] . . . home . . . ."). For instance, inappropriate, abusive, or violent conduct by a parent or other person living in the children's home is a part of the "conditions or surroundings" of the children's home and may produce an environment that endangers their physical or emotional well-being. *In re K.C.F.*, No. 01-13-01078-CV, 2014 WL 2538624, at *12 (Tex. App.—Houston [1st Dist.] June 5, 2014, no pet.) (mem. op.) (internal quotations omitted); *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted); *In re J.T.G.*, 121 S.W.3d at 125.

The relevant time frame for establishing that a parent knowingly placed, or allowed the children to remain, in conditions or surroundings which endangered their physical or emotional well-being is prior to the children's removal. *In re O.R.F.*,

417 S.W.3d 24, 37 (Tex. App.—Texarkana 2013, pet. denied); *In re J.R.*, 171 S.W.3d 558, 569 (Tex. App.—Houston [14th Dist.] 2005, no pet.). And a fact finder may infer from a parent's past conduct endangering the well-being of the children that similar conduct will recur in the future. *A.S. v. Tex. Dep't of Family & Protective Servs.*, 394 S.W.3d 703, 712 (Tex. App.—El Paso 2012, no pet.); *see also In re D.S.*, 333 S.W.3d 379, 384 (Tex. App.—Amarillo 2011, no pet.) (trier of fact may measure parent's future conduct by his past conduct). Subsection D permits termination based upon a single act or omission. *Jordan v. Dossey*, 325 S.W.3d 700, 721 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

Under subsection E, the relevant inquiry is whether evidence exists that the endangerment of the children's physical and emotional well-being was the direct result of a parent's conduct, including acts, omissions, or failures to act. *In re J.T.G.*, 121 S.W.3d at 125; *see also In re S.M.L.*, 171 S.W.3d at 477. It is not necessary to establish that a parent intended to endanger the children in order to support termination of the parent-child relationship. *See In re M.C.*, 917 S.W.2d 268, 270 (Tex. 1996). However, termination under subsection E requires "more than a single act or omission; . . . . a voluntary, deliberate, and conscious course of conduct by the parent" is required. *In re K.P.*, 498 S.W.3d 157, 171 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *see also In re J.T.G.*, 121 S.W.3d at 125. The specific danger to the children's well-being may be inferred from parental misconduct

standing alone, even if the conduct is not directed at the children and they suffer no actual injury. *See Boyd*, 727 S.W.2d at 533; *In re R.W.*, 129 S.W.3d 732, 738 (Tex. App.—Fort Worth 2004, pet. denied). Courts may consider parental conduct that did not occur in the children's presence. *In re A.A.M.*, 464 S.W.3d 421, 426 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *Walker*, 312 S.W.3d at 617.

### 1. Physical Abuse

Abusive and violent conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the children. *In re L.E.S.*, 471 S.W.3d 915, 925 (Tex. App.—Texarkana 2015, no pet.); *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *see also In re S.R.*, 452 S.W.3d at 360 ("[e]nvironment" refers not only to acceptability of living conditions, but also to parent's conduct in home (internal quotations omitted)). Domestic violence, want of self-control, and a propensity for violence may be considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re A.V.W.*, No. 13-12-00684-CV, 2013 WL 1932887, at *5 (Tex. App.—Corpus Christi–Edinburg May 9, 2013, pet. denied) (mem. op.) ("It is self[-]evident that parents perpetrating violence towards certain [other] members of the family threaten the emotional developmental and well-being of any child."). Without question, direct physical abuse of the children clearly

30

endangers them. *In re P.M.B.*, No. 01-17-00621-CV, 2017 WL 6459554, at *8 (Tex. App.—Houston [1st Dist.] Dec. 19, 2017, pet. denied) (mem. op.).

Further, violent acts or abusive acts directed toward one child can endanger other children that are not the direct victims of the physical abuse in question and support termination of parental rights as to the other children. *In re L.M.N.*, 2018 WL 5831672, at *16; *In re W.J.H.*, 111 S.W.3d 707, 716 (Tex. App.—Fort Worth 2003, pet. denied). In other words, the physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home. *In re L.M.N.*, 2018 WL 5831672, at *16; *see also In re E.A.G.*, 373 S.W.3d 129, 142–43 (Tex. App.—San Antonio 2012, pet. denied). Moreover, the fact that the children witness violence directed at another child in the home supports a finding of endangerment. *See In re L.M.N.*, 2018 WL 5831672, at *16; *In re E.J.Z.*, 547 S.W.3d 339, 350 (Tex. App.—Texarkana 2018, no pet.); *see also In re K.S.*, No. 02-14-00073-CV, 2014 WL 3867529, at *8–10 (Tex. App.—Fort Worth Aug. 7, 2014, no pet.) (mem. op.) (evidence sufficient to support termination under subsections D and E where children witnessed violence in home). And evidence that a parent does not remove her children from, or allows them to remain in, a home where there is violent conduct supports termination of parental rights. *In re L.M.N.*, 2018 WL 5831672, at *18; *In re A.V.W.*, 2013 WL 1932887, at *5; *see also In re T.S.*, No. 02-10-00089-CV, 2010 WL 4486332, at *7–8 (Tex. App.—Fort Worth

31

Nov. 10, 2010, no pet.) (mem. op.) (parent continually placed child in environment where violence took place).

Here, there is ample evidence in the record that mother and her boyfriend physically abused R.W., Jr. in the home and that abuse eventually led to the child's death. There is also evidence in the record that mother and her boyfriend physically abused L.R.W. in the home. The children were in the home when mother and her boyfriend physically abused R.W., Jr.

DFPS investigator Capps and DFPS special investigator Jones testified that mother disciplined L.R.W. and R.W., Jr., prior to his death, by making them "get down in [a] push-up position for like an hour or until they got weak" due to muscle failure. Mother also physically disciplined L.R.W. and R.W., Jr. by "whoop[ing]" them with a belt for fifteen minutes at a time, stopping only when L.R.W. or R.W., Jr. began to scream. This physical discipline took place in the bathroom of mother's apartment with the door closed so that the children could not escape. Because L.R.W. and R.W., Jr. moved around when mother hit them various parts of their bodies were hit with a belt. When DFPS caseworker Mangram was asked at trial whether mother "literally trapp[ed] th[e] kids in the bathroom so [that] she c[ould] beat them," Mangram responded, "[y]es." Mother admitted to leaving marks on L.R.W. and R.W., Jr., and Mangram testified that mother's physical discipline of

32

L.R.W. and R.W., Jr. did not constitute "normal . . . spanking discipline." L.R.W. disclosed that mother had "beat[]" her and R.W., Jr. prior to his death.

Additionally, mother's boyfriend, who lived at mother's apartment and who mother allowed to care for the children, admitted to disciplining both L.R.W. and R.W., Jr. by hitting them with his hand and with a belt. And mother admitted to Mangram that she knew that her boyfriend physically disciplined L.R.W. and R.W., Jr. During her interview after R.W., Jr.'s death, L.R.W. stated that mother's boyfriend beat her and R.W., Jr. and he did so while mother was in the same room. L.R.W. also reported that mother's boyfriend made her and R.W., Jr. do "push[-]ups" when they got in trouble. When Mangram was asked whether mother "knew that [her boyfriend] was beating" L.R.W. and R.W., Jr., Mangram responded that "[s]he did." In Mangram's opinion, mother's action in allowing her boyfriend to "beat" L.R.W. and R.W., Jr. constituted endangering conduct and created a dangerous environment.

On the day of R.W., Jr.'s death, mother admitted to physically hitting the child four or five times for fifteen minutes each time. Mother also reported that she had "whoop[ed]" him multiple times in the days leading up to his death. L.R.W. further disclosed that on the day that R.W., Jr. died, mother's boyfriend fought with R.W., Jr. and gave R.W., Jr. a "hard whooping" while mother was in the home.

33

Moreover, mother reported that on the day of R.W., Jr.'s death, her boyfriend locked her out of her apartment while he hit and spanked R.W., Jr. with a belt. Mother heard R.W., Jr. crying loudly from outside her apartment, and when her boyfriend unlocked the door, R.W., Jr. ran to mother and mother told her boyfriend "that was enough," i.e., her boyfriend had hit and spanked R.W., Jr. "enough." Later that day, mother again allowed her boyfriend to care for the children and R.W., Jr., while she left the apartment although she knew that her boyfriend had physically disciplined R.W., Jr. earlier in the day and caused the child to cry loudly.

As previously detailed in the background section, at the time of his death, R.W., Jr. had extensive external and internal injuries. DFPS investigator Capps testified that R.W., Jr.'s numerous injuries indicated that someone had been physically abusing the child for a prolonged period of time. And DFPS caseworker Mangram testified that the marks and bruises on R.W., Jr. did not indicate that what had happened to R.W., Jr. on the day of his death was a "one-time incident." Rather, it appeared that R.W., Jr. had been "abused for a substantial amount of time." Mother took responsibility for any marks and bruises found on R.W., Jr. at the time of his death.

Notably, assistant medical examiner Hopson testified that R.W., Jr.'s death was not an accident and his cause of death was "multiple blunt force injuries." Moreover, the location of R.W., Jr.'s injuries at the time of his death did not indicate

34

that they were caused by a single impact, and his manner of death was a homicide. In other words, "[s]omebody [had] killed th[e] child." Mother was indicted for the felony offense of injury to a child related to R.W., Jr.'s death. *See* TEX. PENAL CODE ANN. § 22.04(a)(1).

On appeal, mother asserts that there is legally and factually insufficient evidence to support findings that she knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being, because the children were not harmed and appeared healthy on the day of R.W., Jr.'s death.

However, contrary to mother's assertions the record reveals that L.R.W., in addition to R.W., Jr., was physically abused by mother and her boyfriend, and when L.R.W. entered DFPS's care, she had "two scars that appeared to be healing, like fork kind of marks that were from like a curling iron [or] like a straightener" and a burn on her leg. And the HCIFS Investigator Death Report included with Hopson's autopsy report states that the children, i.e., L.R.W. and L.D.W., had bruising on them when they were placed in the care of DFPS.

However, even if there was no evidence that the children were physically harmed by mother or her boyfriend, the children need not have suffered actual injury

35

in order for mother's parental rights to be terminated. *See Boyd*, 727 S.W.2d at 533 (endangering conduct need not be directed at children and children need not suffer injury). As previously explained, violent acts or abusive acts directed toward one child endanger the other children in the home who are not the direct victims of the physical abuse in question and support termination of parental rights. *In re L.M.N.*, 2018 WL 5831672, at *16; *In re W.J.H.*, 111 S.W.3d at 716. In other words, the physical abuse of one child in the home supports a finding of endangerment as to the other children also present in the home. *In re L.M.N.*, 2018 WL 5831672, at *16; *In re E.A.G.*, 373 S.W.3d at 142–43; *see also In re K.S.*, 2014 WL 3867529, at *8–10 (evidence sufficient to support termination under subsections D and E where children witnessed violence in home). Further, evidence that a parent does not remove her children from, or allows them to remain in a home where there is violent conduct, supports termination of her parental rights. *In re L.M.N.*, 2018 WL 5831672, at *18; *In re A.V.W.*, 2013 WL 1932887, at *5; *see also In re T.S.*, 2010 WL 4486332, at *7–8 (parent continually placed child in environment where violence took place).

## 2. Domestic Violence

As previously noted, abusive and violent conduct by a parent or other person in the children's home may produce an environment that endangers the children's physical and emotional well-being. *In re L.E.S.*, 471 S.W.3d at 925; *In re J.I.T.P.*,

99 S.W.3d at 845; *see also In re S.R.*, 452 S.W.3d at 360 ("[e]nvironment" refers not only to acceptability of living conditions, but also to parent's conduct in home (internal quotations omitted)).  And domestic violence may be considered as evidence of endangerment.  *In re J.I.T.P.*, 99 S.W.3d at 845; *see also D.N. v. Tex. Dep't of Family & Protective Servs.*, No. 03-15-00658-CV, 2016 WL 1407808, at *2 (Tex. App.—Austin Apr. 8, 2016, no pet.) (mem. op.) ("[D]omestic violence may constitute endangerment, even if the violence is not directed at the child."); *In re A.V.W.*, 2013 WL 1932887, at *5 ("It is self[-]evident that parents perpetrating violence towards certain [other] members of the family threaten the emotional developmental and well-being of any child.").

Further, the fact that the children witness violence directed at another member of the household supports a finding of endangerment.  *See In re A.V.W.*, 2013 WL 1932887, at *4–5; *see also In re E.J.Z.*, 547 S.W.3d at 350; *In re K.S.*, 2014 WL 3867529, at *8–10 (evidence sufficient to support termination under subsections D and E where children witnessed violence in home).  And evidence that a parent does not remove her children from, or allows them to remain in a home where there is violent conduct, supports termination of her parental rights.  *In re L.M.N.*, 2018 WL 5831672, at *18; *In re A.V.W.*, 2013 WL 1932887, at *5; *see also In re T.S.*, 2010 WL 4486332, at *7–8 (parent continually placed child in environment where violence took place).

Mother's FSP states that mother reported a history of domestic violence with the children's father before his death and a history of domestic violence with her boyfriend, who was "in and out of the home." *See In re S.Z.*, No. 04-18-00095-CV, 2018 WL 3129442, at *2, *4–7 (Tex. App.—San Antonio June 27, 2018, pet. denied) (mem. op.) (evidence sufficient to support finding parent placed or allowed child to remain in conditions or surroundings that endangered her physical and emotional well-being where parent admitted to history of domestic violence); *In re J.D.W.*, No. 11-11-00027-CV, 2011 WL 3653810, at *2 (Tex. App.—Eastland Aug. 18, 2011, no pet.) (mem. op.) (evidence sufficient where parent admitted he had engaged in domestic violence).

### 3. Sexual Abuse

A parent endangers her children by accepting the endangering conduct of other people. *See In re T.C.*, No. 01-17-00497-CV, 2018 WL 4126600, at *16 (Tex. App.—Houston [1st Dist.] Aug. 30, 2018, pet. denied) (mem. op.); *In re K.K.D.B.*, No. 14-17-00302-CV, 2017 WL 4440546, at *9 (Tex. App.—Houston [14 Dist.] Oct. 5, 2017, pet. denied) (mem. op.); *see also Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."). Without question, sexual abuse constitutes conduct that endangers the children's physical and emotional well-being. *In re A.B.*, 125 S.W.3d 769, 775 (Tex. App.—Texarkana 2003, pet. denied).

Further, inappropriate, abusive, or unlawful conduct by persons who live in the children's home or with whom the children are compelled to associate on a regular basis in their home is a part of the "conditions or surroundings" of the children's home. *P.A.G. v. Tex. Dep't of Family & Protective Servs.*, 458 S.W.3d 595, 600 (Tex. App.—El Paso 2014, no pet.); *In re M.R.J.M.*, 280 S.W.3d at 502 (internal quotations omitted). And abusive conduct by a parent or other person in the children's home may produce an environment that endangers the physical and emotional well-being of the children. *In re L.E.S.*, 471 S.W.3d at 925; *In re J.I.T.P.*, 99 S.W.3d at 845; *see also In re S.R.*, 452 S.W.3d at 360.

Although parental knowledge that an actual offense has occurred is not required, evidence that a parent knows that her child is being sexually abused and does nothing supports findings that she knowingly placed, or allowed the child to remain, in conditions or surroundings that endangered her physical or emotional well-being, or she engaged, or knowingly placed the child with persons who engaged, in conduct that endangered the physical or emotional well-being of the child. *See In re C.G.*, No. 13-05-063-CV, 2006 WL 220627, at *4–5 (Tex. App.—Corpus Christi–Edinburg Jan. 26, 2006, no pet.) (mem. op.); *In re S.P.*, 168 S.W.3d 197, 204–05 (Tex. App.—Dallas 2005, no pet.); *see also Pruitt v. Tex. Dep't of Family & Protective Servs.*, No. 03-10-00089-CV, 2010 WL 5463861, at *6–7 (Tex. App.—Austin Dec. 23, 2010, no pet.) (mem. op.) (parent endangered child by

exposing her to boyfriend who sexually abused child); *Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards.").

Here, the record reveals that after L.R.W. entered DFPS's care, she reported that mother's boyfriend had sexually abused her. L.R.W. explained that mother's boyfriend "g[ot] naked and g[ot] in the bed with her." When mother then walked into the room, she told her boyfriend to stop, but he did not and mother "didn't do anything about it." L.R.W. further disclosed that mother's boyfriend "touch[ed] her pee pee" and "rubb[ed] her pee pee," she told mother, and mother "had seen it." DFPS caseworker Mangram opined that the fact that L.R.W. was sexually abused in mother's home created a dangerous environment for the children. *See In re T.C.*, 2018 WL 4126600, at *15–16; *In re K.K.D.B.*, 2017 WL 4440546, at *9 (parent allowing child to have contact with person who committed sexual offense constitutes endangering conduct by parent); *see, e.g.*, *In re C.C.*, Nos. 07-15-00185-CV, 07-15-00220-CV, 2015 WL 5766513, at *4–5 (Tex. App.—Amarillo Sept. 29, 2015, no pet.) (mem. op.) (parent's lifestyle, which included dating registered sex offender, constituted conscious course of endangering conduct); *see also In re L.C.*, 145 S.W.3d 790, 797–98 (Tex. App.—Texarkana 2004, no pet.) ("Without the protection of their mother, the children may suffer continued abuse and may feel less inclined to report any abuse.").

40

Although there is no evidence that L.D.W. was sexually abused by mother's boyfriend, such evidence is not required to support termination of mother's parental rights. *See Boyd*, 727 S.W.2d at 533 (endangering conduct need not be directed at children and children need not suffer injury). In fact, when one child has been sexually abused in the home, we may infer that other children in the home are endangered. *See In re E.A.G.*, 373 S.W.3d at 143–44 (sexual abuse of one child created surroundings that endangered other children); *In re C.G.*, 2006 WL 220627, at *4; *see also In re T.D.S.*, No. 13-15-00107-CV, 2015 WL 5110472, at *19 (Tex. App.—Corpus Christi–Edinburg Aug. 28, 2015, no pet.) (mem. op.) (evidence of sexual abuse of another child relevant to determining endangerment); *In re E.A.K.*, 192 S.W.3d 133, 151 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) ("The basic logic of these cases is that a trier of fact may infer endangerment to one child from actual harm caused to another child."). In other words, it is not necessary for the sexual abuse occurring in the home to be directed at the child whose interest is in question for the home to constitute a dangerous place. *See In re Tidwell*, 35 S.W.3d 115, 120 (Tex. App.—Texarkana 2000, no pet.).

### 4. Narcotics Use

As previously noted, a parent endangers her children by accepting the endangering conduct of other people. *See In re T.C.*, 2018 WL 4126600, at *16; *In re K.K.D.B.*, 2017 WL 4440546, at *9; *see also Jordan*, 325 S.W.3d at 721 ("[A]

child is endangered when the environment creates a potential for danger which the parent is aware of but disregards."). This includes a parent's exposure of her children to illegal narcotics use by a person in the children's home. *See In re K.K.D.B.*, 2017 WL 4440546, at *9; *see also In re O.N.H.*, 401 S.W.3d 681, 684 (Tex. App.—San Antonio 2013, no pet.). Further, illegal narcotics use by a caregiver supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re M.F.*, No. 2-09-012-CV, 2009 WL 5183780, at *4–5 (Tex. App.—Fort Worth Dec. 31, 2009, no pet.) (mem. op.); *In re J.T.G.*, 121 S.W.3d at 125.

DFPS investigator Capps testified that mother knowingly left the children and R.W., Jr. in the care of her boyfriend who used illegal narcotics and smoked marijuana while caring for the children and R.W., Jr. Further, DFPS caseworker Mangram explained that mother's boyfriend kept marijuana and marijuana paraphernalia in mother's home, specifically in the top drawer of mother's nightstand, and it was "[c]leary evident to anyone." *See Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards.").

Moreover, mother's boyfriend admitted to smoking marijuana while caring for the children and R.W., Jr. And on the day that R.W., Jr. died, mother's FSP notes that her boyfriend, while caring for the children and R.W., Jr., was smoking

42

marijuana in another room of mother's apartment when R.W., Jr. purportedly fell off a bunk bed and began crying and throwing up. In Mangram's opinion, a parent who knowingly left her children with someone who smoked marijuana while caring for the children engaged in endangering conduct and created a dangerous environment. *See In re M.F.*, 2009 WL 5183780, at *4–5 (evidence sufficient to support finding parent knowingly placed child in conditions and engaged in conduct that endangered child's physical or emotional well-being where parent knowingly left child with a caregiver who used narcotics); *In re D.R.J.*, No. 07-08-0410-CV, 2009 WL 1953402, at *5–7 (Tex. App.—Amarillo July 8, 2009, pet. denied) (mem. op.) (same); *In re R.D.H.*, No. 12-03-00390-CV, 2005 WL 1000617, at *5–6 (Tex. App.—Tyler Apr. 29, 2005, no pet.) (mem. op.) (mother left children in home with caregiver who smoked marijuana).

## 5. Living Conditions

Allowing children to live in unsanitary conditions can support a finding that a parent has endangered the children's physical and emotional well-being. *D.K., Sr. v. Tex. Dep't of Family & Protective Servs.*, No. 03-13-00816-CV, 2014 WL 1910337, at *4 (Tex. App.—Austin May 9, 2014, no pet.) (mem. op.); *In re A.T.*, 406 S.W.3d 365, 371 (Tex. App.—Dallas 2013 pet. denied); *In re P.E.W.*, 105 S.W.3d 771, 777 (Tex. App.—Amarillo 2003, no pet.) ("[A] child's exposure to continually unsanitary living conditions . . . may prove endangerment."). Notably,

the children "need not develop or succumb to a malady due to th[e] [unsanitary] conditions before it can be said that" they were endangered. *In re P.E.W.*, 105 S.W.3d at 777; *see also Boyd*, 727 S.W.2d at 533 (endangerment encompasses "more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment," but endangering conduct need not be directed at children and children need not suffer injury).

Here, the record contains evidence that the children lived in unsanitary conditions prior to entering DFPS's care. An HCIFS Investigator Death Report notes that after R.W., Jr.'s death, mother's home was found to be unkempt. And DFPS special investigator Jones testified that after R.W., Jr.'s death and during his investigation, he went to mother's apartment and found it to be unclean. The apartment was cluttered and had old food and trash all around. Jones also found "blood droplets" on the walls. In Jones's opinion, the condition of mother's home alone was endangering to the children. *See In re A.L.*, 545 S.W.3d 138, 146–47 (Tex. App.—El Paso 2017, no pet.) (noting clutter in home when determining evidence sufficient to support finding parent placed or knowingly allowed child to remain in condition or surrounding that endangered her emotional and physical well-being); *In re M.F.*, 173 S.W.3d 220, 224–25 (Tex. App.—Dallas 2005, no pet.) (evidence sufficient to support finding mother allowed child to remain in conditions

44

or surroundings which endangered him where home was "cluttered and full of trash").

Although mother asserts on appeal that at the time of R.W., Jr.'s death, children were not harmed and appeared healthy, the children need not suffer an injury or harm because of the conditions or surroundings to which they are exposed in order for evidence to be sufficient to support a finding that the parent knowingly placed, or allowed the children to remain, in conditions that endangered their physical and emotional well-being. *See Boyd*, 727 S.W.2d at 533; *In re P.E.W.*, 105 S.W.3d at 777.

\* \* \*

Viewing the evidence in the light most favorable to the trial court's findings, we conclude that the trial court could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or mother engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being. *See* TEX. FAM. CODE ANN. § 161.001(b)(1)(D), (E). And, viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical

45

and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.*

Further, we conclude that the trial court could have reconciled any disputed evidence in favor of finding that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being. And any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's findings that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being. *See id.*

We overrule mother's first issue.

As previously noted, only one predicate finding under Texas Family Code section 161.001(b)(1) is necessary to support termination of mother's parental rights to the children. *See In re A.V.*, 113 S.W.3d at 363. Accordingly, having held that the evidence is legally and factually sufficient to support the trial court's findings, under Texas Family Code sections 161.001(b)(1)(D) and (E), that mother knowingly placed, or knowingly allowed the children to remain, in conditions or surroundings which endangered their physical and emotional well-being or she engaged, or knowingly placed the children with persons who engaged, in conduct that endangered their physical and emotional well-being, we need not address mother's second issue challenging the trial court's finding, under Texas Family Code section 161.001(b)(1)(O), i.e., that mother failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children. *See id.*; *Walker*, 312 S.W.3d at 618; *see also* TEX. R. APP. P. 47.1.

## B. Best Interest of Children

In her third issue, mother argues that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of the children because "the desires of the children presumably would be to remain in" mother's life, it is speculative as to whether the children's foster parents will meet the children's future physical and emotional needs, it is

47

speculative as to whether the children's foster parents' home will remain safe and stable, mother "wants to parent her own children," presumably mother's FSP would be modified upon restoration of her parental rights, and "[d]epending on who [is] ask[ed]," mother "has or has not admitted her role in the death of" R.W., Jr.

A strong presumption exists that the children's best interest is served by maintaining the parent-child relationship. *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). However, it is also presumed that the prompt and permanent placement of the children in a safe environment is in their best interest. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re D.S.*, 333 S.W.3d at 383. The best-interest analysis evaluates the best interest of the children, not the parent. *See In re D.S.*, 333 S.W.3d at 384.

In determining whether the termination of mother's parental rights is in the best interest of the children, we may consider several factors, including: (1) the children's desires; (2) the current and future physical and emotional needs of the children; (3) the current and future emotional and physical danger to the children; (4) the parental abilities of the parties seeking custody; (5) whether programs are available to assist those parties; (6) plans for the children by the parties seeking custody; (7) the stability of the proposed placement; (8) the parent's acts or omissions that may indicate that the parent-child relationship is not proper; and (9) any excuse for the parent's acts or omissions. *See Holley v. Adams*, 544 S.W.2d

367, 371–72 (Tex. 1976); *In re L.M.*, 104 S.W.3d at 647. We may also consider the statutory factors set forth in Texas Family Code section 263.307. *See* TEX. FAM. CODE ANN. § 263.307; *In re A.C.*, 560 S.W.3d 624, 631 n.29 (Tex. 2018); *In re C.A.G.*, No. 01-11-01094-CV, 2012 WL 2922544, at *6 (Tex. App.—Houston [1st Dist.] June 12, 2012, no pet.) (mem. op.).

These factors are not exhaustive, and there is no requirement that DFPS prove all factors as a condition precedent to the termination of parental rights. *See In re C.H.*, 89 S.W.3d at 27; *see also In re C.L.C.*, 119 S.W.3d 382, 399 (Tex. App.—Tyler 2003, no pet.) ("[T]he best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors."). The same evidence of acts and omissions used to establish grounds for termination under section 161.001(b)(1) may also be relevant to determining the best interest of the children. *See In re C.H.*, 89 S.W.3d at 28; *In re L.M.*, 104 S.W.3d at 647. The trial court is given wide latitude in determining the best interest of the children. *Gillespie v. Gillespie*, 644 S.W.2d 449, 451 (Tex. 1982); *see also Cuellar v. Flores*, 238 S.W.2d 991, 992 (Tex. App.—San Antonio 1951, no writ) (trial court "faces the parties and the witnesses, observes their demeanor and personality, and feels the forces, powers, and influences that cannot be discerned by merely reading the record").

### 1. Children's Desires

At the time mother's parental rights were terminated, L.R.W. was six years old and L.D.W. was two years old. The children were placed together in an adoptive foster home, and the children had been in that foster home for more than one year. DFPS caseworker Mangram testified the foster home was safe, stable, nurturing, and loving. L.R.W. was "very close" with her foster family and she relied on her foster parents for emotional support. The foster family was all that L.D.W. had ever known, L.D.W. interacted with his foster parents, and he did not leave his foster parents' side. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering young child had spent majority of life with foster parents and foster family only family child had ever known); *In re J.S.B.*, Nos. 01-17-00480-CV, 01-17-00481-CV, 01-17-00484-CV, 2017 WL 6520437, at *17 & n.41 (Tex. App.—Houston [1st Dist.] Dec. 17, 2017, pet. denied) (mem. op.) (children did not recognize parent as their parent and younger child had spent majority of life living away from parent). The children both "look[ed] to their foster parents for comfort and care," and they were comfortable living with their foster parents. Moreover, the children's foster parents had provided for the children's needs, and Mangram believed that they would continue meeting the children's emotional and physical needs in the future. The children were not in emotional or physical danger in their foster parents' home. The children's foster parents had excellent parenting abilities, had taken advantage

of the services and the programs that were available to them, and the children were receiving any therapy, medical attention, and dental work that was required. The children's foster parents believed that education was important, and they wanted the children to graduate high school and attend college. *See In re L.M.N.*, 2018 WL 5831672, at *20 (considering evidence children doing well in placement with foster parents, who were meeting children's needs); *In re M.L.R-U., Jr.*, 517 S.W.3d 228, 238 (Tex. App.—Texarkana 2017, no pet.) (considering evidence foster family provided safe and healthy environment when determining children's desires).

According to Mangram, L.R.W. wanted to continue living with her foster parents, and she expressed fears of being seriously harmed in the care of mother and mother's boyfriend. *See In re C.M.C.*, 273 S.W.3d 862, 876 (Tex. App.—Houston [14th Dist.] 2008, no pet.) (child afraid of parent and "adamant that he d[id] not want to return to live with her and want[ed] to remain with his current family"). Although there is no specific evidence of L.D.W.'s desires, when a child is too young to express his desires, a fact finder may consider evidence that the child is bonded with his foster family, receives good care in the current placement, and has spent minimal time with a parent. *In re L.M.N.*, 2018 WL 531672, at *20; *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.).

Notably, the children's foster parents wanted to the children to continue living with them. The children had also formed a sibling bond with the foster parents'

51

grandchild who lived in the home. The children's bond with their foster family implies that the children's desires would be fulfilled by adoption by the foster family. *See In re T.C.C.H.*, No. 07-11-00179-CV, 2011 WL 6757409, at *9 (Tex. App.—Amarillo Dec. 22, 2011, no pet.) (mem. op.).

### 2. Current and Future Physical and Emotional Needs and Current and Future Physical and Emotional Danger

#### a. Safe and Stable Home

The children's need for a safe and stable home is the paramount consideration in assessing the best interest of the children. *See* TEX. FAM. CODE ANN. § 263.307(a) (prompt and permanent placement of child in safe environment presumed to be in child's best interest); *In re G.M.G.*, 444 S.W.3d 46, 60 (Tex. App.—Houston [14 Dist.] 2014, no pet.) (parent who lacks ability to provide child with safe and stable home is unable to provide for child's emotional and physical needs); *In re K.C.*, 219 S.W.3d 924, 931 (Tex. App.—Dallas 2007, no pet.); *Adams v. Tex. Dep't of Family & Protective Servs.*, 236 S.W.3d 271, 280 (Tex. App.—Houston [1st Dist.] 2007, no pet.) (in children's best interest to be raised in consistent, stable, and nurturing environment). Here, there is no evidence in the record that mother is able to provide the children with a safe and stable home. *See In re P.S.*, No. 02-16-00458-CV, 2017 WL 1173845, at *9 (Tex. App.—Fort Worth Mar. 30, 2017, no pet.) (mem. op.) (children's basic needs include safe and stable home environment); *see also Adams*,

236 S.W.3d at 280 (parent's history of failing to provide children with "stable and nurturing environment" demonstrates termination of parental rights in best interest).

Here, the record contains evidence that the children lived in unsanitary conditions prior to entering the care of DFPS. An HCIFS Investigator Death Report notes that after R.W., Jr.'s death, mother's home was found to be unkempt. And DFPS special investigator Jones testified that after R.W., Jr.'s death and during his investigation, he found mother's apartment to be unclean. The apartment was cluttered and had old food and trash all around. Jones also found "blood droplets" on the walls. In Jones's opinion, the condition of mother's home alone was endangering to the children. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(D) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills including providing "a safe physical home environment"); *In re A.L.*, 545 S.W.3d at 148 (home's unsanitary and unsafe conditions, including clutter, relevant in determining emotional and physical needs of child and emotional and physical danger to child).

### b. Violence and Abuse

The children's exposure to violence in the home undermines the safety of the home environment and is relevant when considering best interest. *See In re A.K.*, Nos. 07-17-00353-CV, 07-17-00354-CV, 2018 WL 912703, at *5 (Tex. App.— Amarillo Feb. 15, 2018, pet. denied) (mem. op.); *see also In re O.N.H.*, 401 S.W.3d

53

at 685 ("[I]t [is] a form of abuse for the children to be exposed to an environment where physical abuse occurred even if it was not directed toward them."). And a parent's inability or unwillingness to protect a child from repeated abuse is a relevant consideration. *See In re L.M.N.*, 2018 WL 5831672, at \*22; *In re A.A.T.*, No. 04-16-00344-CV, 2016 WL 7448370, at \*15–16 (Tex. App.—San Antonio Dec. 28, 2016, no pet.) (mem. op.); *see also In re S.B.*, 207 S.W.3d 877, 886–87 (Tex. App.— Fort Worth 2006, no pet.) (parent's violent behavior while children in home placed them in severe emotional danger). Further, a parent's past performance as a parent is relevant to a determination of her present and future abilities to provide for a child. *In re C.H.*, 89 S.W.3d at 28; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied) (trial court may measure parent's future conduct by past conduct); *see also Schaban-Maurer v. Maurer-Schaban*, 238 S.W.3d 815, 824 (Tex. App.—Fort Worth 2007, no pet.) ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

As previously detailed, the record reveals that mother and her boyfriend engaged in extensive physical abuse of R.W., Jr., which eventually led to the child's death. *See Jordan*, 325 S.W.3d at 724 (evidence of how parent treated another child is relevant). Mother and her boyfriend also physically abused L.R.W. in the home, and mother's boyfriend sexually abused L.R.W. *See* TEX. FAM. CODE ANN.

54

§ 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *Clements v. Haskovec*, 251 S.W.3d 79, 87 (Tex. App.—Corpus Christi–Edinburg 2008, no pet.) (evidence parent in past engaged in abusive conduct permits inference parent will continue behavior in future); *see also In re K.S.*, 420 S.W.3d 852, 856 (Tex. App.—Texarkana 2014, no pet.) ("[The] past is [a] prologue[;] there is a great likelihood that [a parent's] conduct w[ill] continue into the future. Actions speak louder than words."). Mother also knew that her boyfriend physically abused L.R.W. and R.W., Jr. and L.R.W. stated that mother knew that her boyfriend was sexually abusing the child. Although there is no direct evidence that mother or her boyfriend physically or sexually abused L.D.W., he was present in the home when the extensive abuse of mother's other two children was occurring.[8] *See Conti v. Tex. Dep't of Family & Protective Servs.*, No. 01-10-00185-CV, 2011 WL 286143, at *8 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, pet. denied) (parent did not provide stable home for children where one child sexually abused and other child lived in same house).

Mother's FSP further states that mother reported a history of domestic violence with the children's father before his death and a history of domestic

---

[8] We do note that the HCIFS Investigator Death Report included with assistant medical examiner Hopson's autopsy report states that *both* L.R.W. and L.D.W. had bruising on them when they entered the care of DFPS.

violence with her boyfriend, who was "in and out of the home."  *See* TEX. FAM. CODE ANN. § 263.307(b)(7) (in determining whether parent able to provide child with safe environment, considering history of abusive and assaultive conduct by child's family and others with access to child's home); *In re N.J.H.*, No. 01-18-00564-CV, 2018 WL 6617360, at *8 (Tex. App.—Houston [1st Dist.] Dec. 18, 2018, no pet. h.) (mem. op.) (history of domestic violence supports trial court's finding that termination of parental rights in child's best interest); *In re J.S.– A*, No. 01-17-00491-CV, 2018 WL 891236, at *8 (Tex. App.—Houston [1st Dist.] Feb. 15, 2018, pet. denied) (mem. op.) (evidence of violence in home supports finding placement of children with parent likely to subject them to emotional and physical danger now and in future).  And the FSP notes that mother was unwilling and unable to protect the children from those who might harm them.

### c. Narcotics Use

As previously noted, a parent endangers her children by accepting the endangering conduct of other people.  *See In re T.C.*, 2018 WL 4126600, at *16; *In re K.K.D.B.*, 2017 WL 4440546, at *9; *see also Jordan*, 325 S.W.3d at 721 ("[A] child is endangered when the environment creates a potential for danger which the parent is aware of but disregards.").  This includes a parent's exposure of her children to illegal narcotics use by a person in the children's home.  *See In re K.K.D.B.*, 2017 WL 4440546, at *9; *see also In re O.N.H.*, 401 S.W.3d at 684.

56

Further, the children's basic needs include appropriate supervision. *In re C.M.W.*, No. 01-02-00474-CV, 2003 WL 579794, at *5 (Tex. App.—Houston [1st Dist.] Feb. 27, 2003, no pet.) (mem. op.). And illegal narcotics use by a caregiver supports the conclusion that the children's surroundings endanger their physical or emotional well-being. *See In re J.T.G.*, 121 S.W.3d at 125.

DFPS investigator Capps testified that mother knowingly left the children and R.W., Jr. in the care of her boyfriend who used illegal narcotics and smoked marijuana while caring for the children and R.W., Jr. *See In re S.B.*, 207 S.W.3d at 886 (parent's poor judgment may be considered in determining child's best interest); *see also In re D.M.*, 452 S.W.3d 462, 471–74 (Tex. App.—San Antonio 2014, no pet.) (considering children exposed to narcotics use in holding evidence sufficient to support best-interest finding); *In re J.W.*, No. 2-08-211-CV, 2009 WL 806865, at *5, *7 (Tex. App.—Fort Worth Mar. 26, 2009, no pet.) (mem. op.) (same). Further, DFPS caseworker Mangram explained that mother's boyfriend kept marijuana and marijuana paraphernalia in mother's home, specifically in the top drawer of mother's nightstand, and it was "[c]leary evident to anyone." In Mangram's opinion, a parent who knowingly left her children with someone who smoked marijuana while caring for the children engaged in endangering conduct and created a dangerous environment. *See In re M.F.*, 2009 WL 5183780, at *6 (parent knowingly allowed

57

child to stay with caregiver who used narcotics); *In re R.D.H.*, 2005 WL 1000617, at *5–6 (mother left children in home with caregiver who smoked marijuana).

### d. Medical Care

The children's basic needs include medical care. *See In re K-A.B.M.*, 551 S.W.3d 275, 288 (Tex. App.—El Paso 2018, no pet.); *In re P.S.*, 2017 WL 1173845, at *9. In deciding that termination of parental rights is in the best interest of the children, the trier of fact may consider evidence that a parent neglected to seek appropriate medical treatment for her children. *See In re J.R.W.*, No. 14-12-00850-CV, 2013 WL 507325, at *9 (Tex. App.—Houston [14th Dist.] Feb. 12, 2013, pet. denied) (mem. op.); *see also* TEX. FAM. CODE ANN. § 263.307(b)(12)(A), (F) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills including providing health care and understanding children's needs). Likewise, the trier of fact may infer from a parent's past inattention to her children's medical needs that such inattention will continue in the future. *See In re L.G.R.*, 498 S.W.3d 195, 205–06 (Tex. App.—Houston [14th Dist.] 2016, pet. denied); *In re J.R.W.*, 2013 WL 507325, at *9; *see also In re B.K.D.*, 131 S.W.3d 10, 17 (Tex. App.—Fort Worth 2003, pet denied) (fact finder may infer that past conduct endangering child's well-being may recur in the future if child returned to parent). Evidence of how a parent has treated another child is relevant. *See Jordan*, 325

S.W.3d at 724; *see also In re C.R.*, No. 01-17-00725-CV, 2018 WL 1161810, at *7 (Tex. App.—Houston [1st Dist.] Mar. 6, 2018, pet. denied) (mem. op.).

DFPS caseworker Mangram testified, related to R.W., Jr.'s death, that mother reported to hospital personnel that on the day of R.W., Jr.'s death, her boyfriend had stated that R.W., Jr. had fallen out of his bed and was vomiting at approximately 8:45 p.m. Assuming such a report was true, then, according to Mangram, mother and her boyfriend waited an hour before calling for emergency assistance. In Mangram's opinion, the delay in seeking medical treatment for R.W., Jr. was significant and inexcusable. *See Spurk v. Tex. Dep't of Family & Protective Servs.*, 396 S.W.3d 205, 222–24 (Tex. App.—Austin 2013, no pet.) (considering parent's delay in seeking medical treatment in holding evidence sufficient to support finding termination in child's best interest); *see also In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct). Further, Mangram noted that R.W., Jr.'s injuries at the time of his death indicated that he had been "abused for a substantial amount of time," and according to Mangram, mother did not seek medical treatment for his injuries. *See In re J.R.W.*, 2013 WL 507325, at *9 (parent's neglect in seeking medical treatment during critical time impacts physical and emotional needs of child); *see also In re E.D.*, 419 S.W.3d at 620. Similarly, mother's FSP states that R.W., Jr. was singled out and physically beaten to death by mother and her boyfriend, and the child was denied essential medical

59

treatment. *See In re J.R.W.*, 2013 WL 507325, at *9; *Spurk*, 396 S.W.3d at 222–24; *see also In re E.D.*, 419 S.W.3d at 620.

### 3. Parental Abilities, Plans for Children, Stability of Proposed Placement, and Availability of Assistance

#### a. Discipline

Abusive conduct is relevant to a parent's parental abilities and her abilities to care for her children's needs. *In re C.A.*, No. 05-18-00645-CV, 2018 WL 5905634, at *14–15 (Tex. App.—Dallas Nov. 12, 2018, no pet.) (mem. op.). DFPS investigator Capps and DFPS special investigator Jones testified that mother disciplined L.R.W. and R.W., Jr., prior to his death, by making them "get down in [a] push-up position for like an hour or until they got weak" due to muscle failure. Mother also physically disciplined L.R.W., who was five years old at the time, and R.W., Jr., who was two years old at the time, by "whoop[ing]" them with a belt for fifteen minutes at a time, stopping only when L.R.W. or R.W., Jr. began to scream. This physical discipline took place in the bathroom of mother's apartment with the door closed so that the children could not escape. Because L.R.W. and R.W., Jr. moved around when mother physically disciplined them, various parts of their bodies were hit with a belt. When DFPS caseworker Mangram was asked at trial whether mother "literally trapp[ed] th[e] kids in the bathroom so [that] she c[ould] beat them," Mangram responded, "[y]es." Mother admitted to leaving marks on L.R.W. and R.W., Jr., and Mangram testified that mother's physical discipline of

L.R.W. and R.W., Jr. did not constitute "normal . . . spanking discipline." L.R.W. disclosed that mother had "beat[]" her and R.W., Jr. prior to his death. *See In L.M.N.*, 2018 WL 5831672, at *22 (in regard to parental abilities noting mother physically abused child).

Mother also knowingly allowed her boyfriend to physically discipline L.R.W. and R.W., Jr. with his hand or a belt. And on the day of R.W., Jr.'s death mother physically disciplined L.R.W. and R.W., Jr. for an hour each for reasons that included dropping food on the floor. Mother also allowed her boyfriend to physically discipline R.W., Jr. that day for "not sitting on a potty." *See In re S.S.*, No. 13-14-00433-CV, 2015 WL 234069, at *9 (Tex. App.—Corpus Christi–Edinburg Jan. 15, 2015, no pet.) (mem. op.) (evidence mother abused small child for failing to put shoes on correctly and allowed other parent to abuse small child weighed against her as parent); *cf. In re J.F.*, No. 06-15-00033-CV, 2015 WL 7293322, at *9 (Tex. App.—Texarkana Nov. 19, 2015, no pet.) (mem. op.) (appropriate discipline reflects positively on parental abilities).

Mother's FSP further states that mother had a significant lack of knowledge concerning child development and a significant lack of parenting skills needed to meet any child's behavioral and developmental needs. And mother's disciplining behaviors seemed violent, out of control, and disproportionately harsh compared to L.R.W.'s and R.W., Jr.'s misbehavior. *See In re E.D.*, 419 S.W.3d at 620 (trial court

61

may measure parent's future conduct by past conduct); *Schaban*, 238 S.W.3d at 824 ("[T]rial courts [have] relied on evidence of past violence as an indicator of future behavior in parental termination and child custody cases.").

### b. Supervision of Children

The record reveals that mother left the children and R.W., Jr., prior to his death, in the sole care of her boyfriend despite the fact that she was aware that he physically disciplined L.R.W. and R.W., Jr. with his hand or a belt, he used narcotics while caring for the children and R.W., Jr., and he had sexually abused L.R.W. *See* TEX. FAM. CODE ANN. § 263.307(b)(12)(C) (in determining whether parent willing and able to provide child with safe environment, considering whether parent demonstrates adequate parenting skills including "supervision consistent with the child's safety"); *In re A.J.B.*, No. 10-18-00274-CV, 2018 WL 6684808, at *3 (Tex. App.—Waco Dec. 19, 2018, no pet.) (mem. op.) ("[Y]oung children are particularly vulnerable if left in the custody of a [caregiver] who is unable or unwilling to protect them or attend to their needs because they have no ability to protect themselves."); *In re S.B.*, 207 S.W.3d at 886 (parent's poor judgment may be considered in determining child's best interest); *In re C.M.W.*, 2003 WL 579794, at *5 (children's basic needs include appropriate supervision).

### c. Medical Care

As previously noted, the record reveals that mother failed to seek appropriate medical treatment for R.W., Jr. prior to his death. *See Jordan*, 325 S.W.3d at 724 (evidence of how parent treated another child is relevant); *see also In re C.R.*, 2018 WL 1161810, at *7 (same). In DFPS caseworker Mangram's opinion, mother's and her boyfriend's delay in seeking medical treatment for R.W., Jr. on the day of his death was significant and inexcusable. *See Spurk*, 396 S.W.3d at 222–24 (considering parent's delay in seeking medical treatment in holding evidence sufficient to support finding termination in best interest of child); *In re R.D.H.*, 2005 WL 1000617, at *13 (although child's injuries required immediate attention, parent waited to seek medical care); *see also In re E.D.*, 419 S.W.3d at 620 (trial court may measure parent's future conduct by past conduct).

Further, Mangram noted that R.W., Jr.'s injuries at the time of his death indicated that he had been "abused for a substantial amount of time," and according to Mangram, mother did not seek medical treatment for the child's injuries. Similarly, mother's FSP states that R.W., Jr. was singled out and physically beaten to death by mother and her boyfriend, and the child was denied essential medical treatment. *See In re J.H.*, No. 07-17-00307-CV, 2017 WL 6459537, at *5 (Tex. App.—Amarillo Dec. 11, 2017, pet. denied) (mem. op.) (in regard to parental

abilities, considering parents' failure to seek prompt medical attention for children when needed).

### d. Safe and Stable Home

As previously discussed, there is no evidence in the record that mother is able to provide the children with a safe and stable home. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re I.L.G.*, 531 S.W.3d 346, 356 (Tex. App.—Houston [14th Dist.] 2017, pet. denied) (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest); *In re J.D.*, 436 S.W.3d at 118 ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest."). Prior to the children entering DFPS's care, they lived with mother, her boyfriend, and R.W., Jr. in a home that was unkempt, unclean, and cluttered, had old food and trash all around, and had "blood droplets" on the walls. At the time of trial, mother lived with the children's maternal grandmother, who had a "CPS history." The maternal grandmother's other three children lived in the home as well. Although the children's maternal grandmother testified that she wanted the children placed in her home, DFPS caseworker Mangram expressed concern about such a placement because the grandmother had access to R.W., Jr. prior to his death and yet never reported any physical abuse that the child had sustained.

### e. Children's Current Placement

As previously noted, the children are placed together in an adoptive foster home with foster parents who want the children to continue living with them. *See* TEX. FAM. CODE ANN. § 263.307(a); *In re I.L.G.*, 531 S.W.3d at 356 (stability of proposed placement important consideration in determining whether termination of parental rights in children's best interest); *In re J.D.*, 436 S.W.3d at 118 ("The goal of establishing a stable, permanent home for a child is a compelling . . . interest."). DFPS caseworker Mangram testified that the foster home was safe, stable, nurturing, and loving. L.R.W. was "very close" with her foster family, and she relied on her foster parents for emotional support. Moreover, the foster family was all that L.D.W. had ever known, L.D.W. interacted with his foster parents, and he did not leave his foster parents' side. The children both "look[ed] to their foster parents for comfort and care" and were comfortable living with their foster parents.

The children's foster parents also provided for the children's needs, and Mangram believed that they would continue meeting the children's emotional and physical needs in the future. The children were not in emotional or physical danger in their foster parents' home. The children's foster parents had excellent parenting abilities, had taken advantage of the services and the programs that were available to them, and the children were receiving any therapy, medical attention, and dental work that were required. The children's foster parents believed that education was

important, and they wanted the children to graduate high school and attend college. Mangram noted that the foster parents' grandchild, who was L.R.W.'s age, lived in the home as well and the children shared a sibling bond with that child.

Mother concedes in her briefing that the children's current placement is safe, stable, and protective and the foster parents are meeting the children's needs. And although mother asserts that we can only speculate as to whether the children's current placement will remain safe and stable and continue meeting the children's physical and emotional needs, a "lack of evidence about [specific] definitive plans" for the children is not dispositive to the best-interest analysis. *In re E.C.R.*, 402 S.W.3d 239, 250 (Tex. 2013) (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28. Instead, we examine the entire record to determine best interest, even where DFPS is "unable to identify with precision the child[ren]'s future home environment." *In re E.C.R.*, 402 S.W.3d at 250 (internal quotations omitted); *see also In re C.H.*, 89 S.W.3d at 28.

*       *       *

Viewing the evidence in the light most favorable to the trial court's finding, we conclude that the trial court could have formed a firm belief or conviction that termination of mother's parental rights is in the best interest of the children. *See* TEX. FAM. CODE ANN. § 161.001(b)(2). And viewing the evidence in a neutral light, we conclude that a reasonable fact finder could have formed a firm belief or

conviction that termination of mother's parental rights is in the best interest of the children. *See id.* We further conclude that the trial court could have reconciled any disputed evidence in favor of finding that termination of mother's parental rights is in children's best interest or any disputed evidence was not so significant that a fact finder could not have reasonably formed a firm belief or conviction that termination is in the best interest of the children.

Accordingly, we hold that the evidence is legally and factually sufficient to support the trial court's finding that termination of mother's parental rights is in the best interest of the children. *Id.*

We overrule mother's third issue.

### Conclusion

We affirm the order of the trial court.


Julie Countiss
Justice

Panel consists of Chief Justice Radack and Justices Goodman and Countiss.